IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Ruth Ann Keffer, | ) | C/A No.: 1:20-1801-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Mary Geiger Lewis, United States District Judge, dated August 17, 2020, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 9].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied

the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

   A.    Procedural History

On July 13, 2016, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on August 26, 2015. Tr. at 113, 114, 165–67, 168–77. Her applications were denied initially and upon reconsideration. Tr. at 115–19. On October 26, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ronald Sweeda. Tr. at 33–55 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 28, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 15–32. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 8, 2020. [ECF No. 1].

   B.    Plaintiff's Background and Medical History

      1.    Background

Plaintiff was 44 years old at the time of the hearing. Tr. at 37. She completed the eleventh grade. Tr. at 38, 192. Her past relevant work ("PRW")

was as a server, a dining room attendant, and a banquet supervisor. Tr. at 50–51. She alleges she has been unable to work since August 26, 2015. Tr. at 38, 165.

### 2. Medical History

On August 26, 2015, Plaintiff presented to Doctors Care for a two-month history of intermittent right lower back pain that radiated to her right leg. Tr. at 394. Artur Wilkoszewski, M.D. ("Dr. Wilkoszewski"), observed no erythema, ecchymosis, mass, nodule, swelling, or tenderness; normal motor function and sensation; no focal deficits; 5/5 muscle strength; and lumbar flexion diminished to 45 degrees and restricted by pain. Tr. at 395. He ordered Tramadol 50 mg and a Medrol Dosepak. *Id.* X-rays showed no acute findings. Tr. at 397.

Plaintiff returned to Doctors Care on September 7, 2015, to request more medication pending an appointment with an orthopedist. Tr. at 398. She complained of severe back pain. *Id.* Dennis Rhoades, D.O. ("Dr. Rhoades"), noted Plaintiff was in mild distress; had moderate swelling, tenderness, positive simulated axial loading, and positive straight-leg raising ("SLR") on the right at L5; and demonstrated moderate pain at the right sacroiliac ("SI") joint. Tr. at 399. He assessed lumbosacral strain and right-sided sciatica. Tr. at 400. He referred Plaintiff to physical therapy,

administered Dexamethasone and Depo-Medrol injections, and prescribed ibuprofen 800 mg and Prednisone 10 mg. *Id.*

Plaintiff presented to Tidelands Health Nextstep Rehabilitation ("Nextstep Rehab") for an initial physical therapy evaluation on September 21, 2015. Tr. at 286–87. Tracy Cobb, PT ("PT Cobb"), indicated Plaintiff had been diagnosed with lumbosacral strain and right sciatica. Tr. at 286. Plaintiff endorsed pain in her right lumbosacral region with radiation into her right posterior thigh. *Id.* She reported loss of motion and stiffness and rated her pain as an eight. *Id.* She stated the pain limited her abilities to sit, stand, walk, and sleep. *Id.* PT Cobb recorded the following on range of motion ("ROM") testing of Plaintiff's lumbar spine: flexion to 25 degrees, extension to five degrees; right lateral bending to zero degrees; left lateral bending to 10 degrees; right hamstring length to 25 degrees; and left hamstring length to 45 degrees. *Id.* She noted Plaintiff demonstrated significant limitations with trunk and bilateral lower extremity mobility because of pain and was quite sensitive upon palpation at the right piriformis and lumbar spine region. Tr. at 287. She recommended Plaintiff attend two physical therapy sessions per week for eight weeks. *Id.*

Plaintiff presented to orthopedic surgeon T. Scott Ellison ("Dr. Ellison") on September 24, 2015. Tr. at 292. She reported right lumbar pain that radiated into her right proximal calf and was associated with tingling. *Id.* Dr.

Ellison observed Plaintiff to walk with a slight limp on the right, appear uncomfortable, sit unweighting her right buttock cheek, demonstrate mild tenderness at the lumbosacral junction to the right of the midline, be "barely able to do a plantar flexor raise on the right when compared to the left," have slightly depressed right ankle reflexes, and experience tightness in the right posterior thigh in response to SLR test. Tr. at 292, 294. He suspected lumbar disc herniation/neurocompressive phenomenon with right leg radiculopathy. Tr. at 294. He recommended lumbar x-rays and magnetic resonance imaging ("MRI") of the lumbar spine. *Id.* He prescribed a trial of Mobic 15 mg, referred Plaintiff to Sara Allen, M.D. ("Dr. Allen"), to establish primary care, and advised Plaintiff to stop smoking. Tr. at 295.

Plaintiff followed up at Nextstep Rehab for sessions on September 30 and October 2, 7, 12, 14, 20, 21, 26, and 28. Tr. at 266–85. On October 28, 2015, Plaintiff continued to report a high level of right lumbar pain with sciatica and endorsed no significant reduction in pain with physical therapy. Tr. at 267. She indicated she was to follow up with Dr. Ellison and was scheduled for an MRI. *Id.* PT Cobb planned to hold off on additional physical therapy pending Plaintiff's visit with Dr. Ellison. *Id.*

On November 3, 2015, an MRI of Plaintiff's lumbar spine showed degenerative disc change at L4–5 and L5–S1 with minimal disc bulging. Tr.

at 296–97. It indicated a slightly flattened anterior thecal sac at L4–5, but no disc herniation or significant canal stenosis. *Id.*

Plaintiff followed up with Dr. Ellison to discuss imaging results on November 12, 2015. Tr. at 291. She reported her symptoms had improved a little bit with physical therapy. *Id.* Dr. Ellison explained that the MRI showed no significant neurocompressive phenomenon such that Plaintiff was not a surgical candidate. *Id.* He assessed low back pain, other intervertebral disc degeneration of the lumbosacral region, right-sided sciatica, tobacco use, noncompliance with other medical treatment and regimen, and problem related to lifestyle. *Id.* He recommended Plaintiff resume physical therapy and continue Mobic. Tr. at 293. He indicated he would refer her to pain management if she failed to improve within six weeks. *Id.* He noted Plaintiff was noncompliant as she had declined to stop smoking. *Id.*

Plaintiff returned to Nextstep Rehab for a physical therapy evaluation on November 18, 2015. Tr. at 262–63. She endorsed right lumbar pain that occasionally radiated into the right posterior thigh. Tr. at 262. She rated her pain as an eight, noting it limited her abilities to sit, stand, walk, and lift. *Id.* She endorsed back and lower extremity weakness. *Id.* PT Cobb noted the following on ROM testing: lumbar flexion to 60 degrees; lumbar extension to five degrees; right lumbar lateral bend to 10 degrees; and left lumbar lateral bend to 20 degrees. *Id.* She recorded 4/5 left and right lower extremity

strength on manual muscle testing. *Id.* She planned to proceed with lumbar stabilization exercises to decrease stress on Plaintiff's spine and for pain control. Tr. at 263. She recommended Plaintiff attend two visits per week for six weeks. *Id.*

On January 14, 2016, Dr. Ellison included the following on a medical release/physician's statement for the South Carolina Department of Social Services ("SCDSS"): "There is NO Disability. She is not disabled." Tr. at 309, 386. He stated Plaintiff was able to work full time for 40 hours a week. *Id.* He further wrote: "GOOD NEWS: She is NOT Disabled. She will be healthier if she <u>STOPS</u> smoking and was informed. She can be a fully productive working member of society." *Id.* (emphasis in original).

On February 11, 2016, Plaintiff complained of persistent moderate-to-severe lower back pain that radiated to her right thigh. Tr. at 419. She indicated physical therapy had been helpful and rated her pain as a five. *Id.* Todd D. Cook, M.D. ("Dr. Cook"), noted: painful right SI joint; normal gait; normal lower extremity muscle tone; no spasm; right SI joint and iliac crest tenderness; painful right buttock; severe restriction of extension of the lumbar spine; normal bilateral hip ROM; 2/4 reflexes in the bilateral Achilles and patellae; normal sensation; normal reflexes; and 5/5 lower extremity muscle strength. Tr. at 422. He ordered one-to-two Tramadol 50 mg tablets per day as needed. *Id.*

Plaintiff presented to pain medicine specialist Stephen Q. Parker, M.D. ("Dr. Parker"), for evaluation for possible injections on March 23, 2016. Tr. at 312–16. She described right-sided pain that radiated down her right calf. Tr. at 313. Dr. Parker noted the following on physical exam: leg and back pain on right femoral stretch; antalgic gait; increased muscle tone in lumbar spine; lumbar spasm; paraspinous tenderness; pain with lumbar extension and rotation; limited active ROM of the lumbar spine with moderate pain; normal lower extremity muscle tone; and normal lower extremity strength. Tr. at 315. He ordered Tramadol 50 mg. Tr. at 316. He assessed spinal stenosis of the lumbosacral region and concluded Plaintiff might benefit from facet blocks from L3 to S1. Tr. at 312. He required Plaintiff sign a pain management agreement. *Id.*

Dr. Parker administered medial branch blocks ("MBBs") at Plaintiff's right L3–4, L4–5, L5–S1, and sacral ala areas on April 4, 2016. Tr. at 317–18. Plaintiff tolerated the procedure well and was discharged in good condition. *Id.* She reported 60% pain relief upon follow up. Tr. at 319. Dr. Parker repeated the MBBs at the same levels on April 11, 2016, with Plaintiff again tolerating the procedure well. *Id.*

On April 15, 2016, Plaintiff reported 60–70% pain relief with improved ROM and rated her pain as a four. Tr. at 320. Dr. Parker prescribed Nucynta

and planned to schedule Plaintiff for radiofrequency lesioning. Tr. at 320, 322.

A report dated April 25, 2016, indicates Plaintiff was likely to respond well to opioid therapy, was at moderate risk for misuse, and had moderately-low pain sensitivity. Tr. at 336–63.

Dr. Parker performed radiofrequency lesioning on the right at L3–4, L4–5, L5-S1, and in the sacral ala on May 2, 2016. Tr. at 323. He completed the procedure without complications, and Plaintiff tolerated it well. *Id.*

Plaintiff reported 50% improvement and rated her pain as a five on May 25, 2016. Tr. at 325. Dr. Parker observed bilateral leg and back pain to femoral stretch, antalgic gait, increased lower extremity and lumbar spine muscle tone, lumbar spasm, paraspinous tenderness, pain with lumbar extension and rotation, limited ROM of the lumbar spine, and pain upon ROM of the lumbar spine and bilateral hips. Tr. at 327.

Plaintiff rated pain in her lower back, gluteal area, and legs as an eight and worsening on June 28, 2016. Tr. at 329. She stated her pain was aggravated by walking, climbing stairs, bending, changing positions, descending stairs, extending, sitting, twisting, and activities of daily living ("ADLs"). *Id.* Dr. Parker observed a painful SI joint, increased muscle tone in the lower extremity and lumbar spine, lumbar spasm, paraspinous tenderness, painful motion, painless buttocks and greater trochanters,

limited ROM of the lumbar spine, normal lower extremity strength, and normal ROM in the bilateral hips, knees, and ankles. Tr. at 331. He ordered Nucynta 50 mg three times daily, as needed and Neurontin 300 mg three times a day. Tr. at 331–32. He also referred Plaintiff to physical therapy. Tr. at 440–41.

On July 26, 2016, Plaintiff reported having started physical therapy the prior day. Tr. at 333. She rated her pain as a seven and noted her medication was helping. *Id.* Dr. Parker refilled Nucynta and Neurontin. Tr. at 335.

On August 30, 2016, Plaintiff reported having sustained a fall over the prior weekend and noted her pain medication was not working. Tr. at 445. She rated her pain as a nine and described it as radiating from her lower back to her bilateral ankles, calves, and feet. *Id.* Dr. Parker ordered Hysingla 30 mg daily and chair back bracing to support weak spinal muscles. Tr. at 445. He refilled Neurontin 300 mg. Tr. at 447.

On September 27, 2016, Plaintiff reported adverse reactions to Hysingla that included dry mouth, tiredness, and memory problems. Tr. at 512. She indicated the back brace helped when she was sitting, but endorsed continued pain in her right leg and hip upon standing and walking. *Id.* She rated her pain as a seven and requested to proceed with epidural steroid

injections ("ESIs"). *Id.* Dr. Parker prescribed Percocet 5-325 mg and discontinued Hysingla. Tr. at 512, 514.

ATI Physical Therapy discharged Plaintiff on October 5, 2016, after 10 visits. Tr. at 526–27. She reported deficits in bending, empty the dishwasher, making her bed, cleaning, vacuuming, sweeping, dressing, donning and doffing shoes and socks, sitting more than 30 minutes, standing more than 30 minutes, and walking. Tr. at 526. She demonstrated no significant changes in ROM, muscle strength, or sensation over the course of treatment. Tr. at 526–27.

On October 13, 2016, state agency psychological consultant Kendra Werden, Psy.D. ("Dr. Werden"), reviewed the record and considered Listing 12.04 for affective disorders. Tr. at 60–61, 71–72. She noted there was "no medical evidence to show that any mental issues significantly affect[ed] Plaintiff's] ability to work." Tr. at 61, 71.

On October 14, 2016, state agency medical consultant Joseph Moore, M.D. ("Dr. Moore"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently balance, stoop, kneel, crouch,

crawl, and climb ramps/stairs; and never climb ladders/ropes/scaffolds. Tr. at 62–64, 73–75.

On October 25, 2016, Plaintiff reported no relief after completing six weeks of physical therapy. Tr. at 508. She rated her pain as an eight and indicated her medication was not working well. Tr. at 508–09. Dr. Parker prescribed Dilaudid 4 mg three times a day, as needed, and Neurontin 300 mg three times a day. Tr. at 510. He scheduled Plaintiff for follow up for lumbar ESI on the right at L4–5. Tr. at 508. He subsequently administered a lumbar transforaminal ESI at the right L4–5 level on November 3, 2016. Tr. at 530–31.

Also on November 3, 2016, Plaintiff presented to the emergency room ("ER") at Grand Strand Regional Medical Center ("Grand Strand"), after having rolled her left ankle inward while descending a hill. Tr. at 476. She complained of pain and swelling. *Id.* Ryan Callihan, PA ("PA Callihan"), observed mild swelling to the left lateral malleolus and limited ROM due to pain. Tr. at 478. X-rays of Plaintiff's left ankle showed a nondisplaced posterior malleolus fracture. Tr. at 484. PA Callihan applied a splint and recommended Plaintiff follow up with her primary care provider for possible hypertension. Tr. at 479, 480.

Plaintiff returned to the ER at Grand Strand on November 5, 2016, reporting left calf pain. Tr. at 461. She indicated her splint felt too tight and

her toes had been burning blue. *Id.* Lisa M. Moyer, PA ("PA Moyer"), observed tenderness in Plaintiff's posterior calf, positive Homan's sign, lateral swelling in her left ankle, lateral distal tenderness in her left ankle, and tenderness of the lateral ligaments and lateral malleolus. Tr. at 464. A venous ultrasound of Plaintiff's left lower extremity showed no evidence of deep venous thrombosis ("DVT") or superficial venous thrombosis ("SVT"). Tr. at 466. PA Moyer replaced Plaintiff's splint and advised her to follow up with an orthopedist. Tr. at 466–67.

Plaintiff followed up with Nathaniel R. Evans, M.D. ("Dr. Evans"), for left ankle pain on November 10, 2016. Tr. at 492–94. She endorsed continued swelling and pain in her left ankle. Tr. at 494. Dr. Evans observed significant swelling and ecchymosis over the lateral malleolus without tenderness to palpation ("TTP") over the Achilles tendon insertion, medial malleolus, or deltoid ligament. *Id.* He placed Plaintiff in a short leg cast and advised her to remain non-weightbearing and to follow up in two weeks. *Id.* He ordered a wheelchair and a rolling knee walker. *Id.*

Plaintiff followed up with Dr. Parker for lumbar ESIs and medication refills on November 15, 2016. Tr. at 504. She endorsed weakness and rated her pain as a nine. Tr. at 504–05. Dr. Parker authorized a disabled parking placard and prescribed Dilaudid 4 mg and MS Contin 15 mg. Tr. at 506.

Plaintiff reported occasional left ankle pain that was improving on December 5, 2016. Tr. at 492. Dr. Evans noted improved swelling around the left ankle, TTP around the posterior tibia, and no TTP over the Achilles tendon insertion, medial malleolus, or deltoid ligament. *Id.* He observed Plaintiff was showing some callus formation and indicated she should remain non-weightbearing for a few more weeks. *Id.*

Plaintiff rated her pain as a four and described it as stable on December 13, 2016. Tr. at 501. She denied needing Percocet and indicated she was functioning better in her ADLs. *Id.* She complained of drug-induced constipation, and Dr. Parker prescribed Linzess and refilled MS Contin 15 mg. Tr. at 501, 503.

On December 29, 2016, Plaintiff reported her left ankle pain had significantly improved. Tr. at 490. She continued to endorse some tenderness to mild palpation around the posterior tibia, but had improved swelling and no TTP over the Achilles tendon insertion, medial malleolus, or deltoid ligament. *Id.* Dr. Evans noted the fracture appeared to have healed well and authorized Plaintiff to bear weight as tolerated and to follow up as needed. *Id.*

On January 10, 2017, Plaintiff complained that her medication was not working. Tr. at 497. She described her pain as worsening and rated it as an eight. Tr. at 498. Dr. Parker noted the following abnormal findings on

physical exam: bilateral leg and back pain with femoral stretch; positive Patrick's test on the right; positive SLR on the right; increased muscle tone in the lumbar spine; and limited ROM of the lumbar spine. Tr. at 500. He refilled MS Contin and instructed Plaintiff to use Dilaudid for breakthrough pain. Tr. at 497.

Plaintiff rated her pain as an eight-to-nine on February 14, 2017. Tr. at 543. She stated it worsened without medication. *Id.* Dr. Parker instructed Plaintiff to increase Dilaudid back to 4 mg twice a day. *Id.*

On March 14, 2017, Plaintiff described pain in her right thigh and hip and increased pain upon standing and bending. Tr. at 549. She rated her pain as an eight. *Id.* Dr. Parker prescribed MS Contin 30 mg twice a day and discontinued Dilaudid. Tr. at 554.

Plaintiff returned to ATI Physical Therapy for an evaluation on March 20, 2017. Tr. at 625. She endorsed left ankle and foot pain, impaired gait difficulty walking, increased edema and pain, and decreased ROM, strength, balance, joint mobility, and proprioception. Tr. at 625. She was authorized to participate in 12 physical therapy sessions over a course of six weeks. Tr. at 626.

On March 23, 2017, a second state agency medical consultant, James M. Lewis, M.D. ("Dr. Lewis"), reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently

lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently balance and crouch; occasionally stoop, crawl, and climb ramps/stairs; never climb ladders/ropes/scaffolds; and avoid concentrated exposure to hazards. Tr. at 90–93, 106–09.

On March 27, 2017, state agency psychological consultant Celine Payne-Gair, Ph.D. ("Dr. Payne-Gair"), reviewed the record and concluded Plaintiff had no medically-determinable mental impairment. Tr. at 89, 105.

On April 11, 2017, Plaintiff reported her medication was working well and that she was able to function better with her ADLs. Tr. at 557. She indicated she had started a clinical trial. *Id.* Dr. Parker refilled MS Contin. Tr. at 558.

On April 13, 2017, an MRI of Plaintiff's lumbar spine showed mild degenerative disc disease ("MDD") and moderate facet arthropathy most pronounced from L4–5 through L5–S1, as well as contact and slight deflection at the left lateral L5–S1 recess. Tr. at 534. It indicated no severe canal or exit narrowing. *Id.* Radiologist Donald E. Olofsson, D.O. ("Dr. Olofsson"), noted a central annular fissure at L5–S1 was a potential source of non-radicular pain. *Id.* X-rays showed mild DDD and facet arthropathy at L5–S1 with no instability on the lateral flexion or extension views. Tr. at 535.

Plaintiff was discharged from ATI Physical Therapy on April 21, 2017, after being unable to attend visits following her acceptance into the clinical trial program. Tr. at 634.

Plaintiff presented to Walter B. J. Schuyler, M.D. ("Dr. Schuyler"), for a Mesoblast left MBB on April 28, 2017. Tr. at 641. She complained of right-sided low back pain that radiated down her right thigh to her knee. *Id.* She rated her pain as a six. *Id.* Dr. Schuyler assessed spondylosis of the lumbosacral region without myelopathy or radiculopathy. *Id.* He administered bilateral MBBs at L4–5 and L5–S1. Tr. at 641–42.

Plaintiff rated her pain as a seven on May 2, 2017. Tr. at 565. She endorsed joint pain and tenderness, but indicated she was better able to function in her ADLs. Tr. at 567, 572. Dr. Parker prescribed Movantik 25 mg and discontinued Linzess for constipation. Tr. at 565. He noted Plaintiff was participating in a workup for a stem cell trial at the Medical University of South Carolina ("MUSC"). *Id.*

On May 16, 2017, Plaintiff reported lower back pain that radiated down her right leg. Tr. at 639. She rated her pain as a 10. *Id.* Dr. Schuyler performed a discogram at L5–S1. Tr. at 639–40. A post-discogram computed tomography ("CT") scan of Plaintiff's lumbar spine showed findings consistent with grade 4 annular tear of the L5–S1 disc, mild DDD and facet

17

arthropathy, contact at the left lateral L5–S1 recess, and no severe stenosis. Tr. at 536.

On or about June 27, 2017,[1] Plaintiff presented to Tim Montague-Smith, PA-C ("PA Montague-Smith"), in Dr. Parker's office for medication refills. Tr. at 576. She rated her pain as a 10 and described it as persistent and worsening. *Id.* PA Montague-Smith refilled Plaintiff's medications and declined her request for a handicapped placard. *Id.*

Plaintiff returned to Dr. Parker for medication refills on or about July 18, 2017. Tr. at 580. She rated her pain as a seven and stable. *Id.* She reported having recently presented to Grand Strand for chest pain, where she received intravenous Morphine. *Id.* Dr. Parker lowered MS Contin to 15 mg twice a day. Tr. at 581.

On August 10, 2017, x-rays of Plaintiff's lumbar spine showed mild DDD and facet arthropathy at L5–S1, no instability on lateral flexion or extension views, and no significant interval change from the prior study. Tr. at 537.

---

[1] PA Montague-Smith signed the treatment note on June 27, 2017, but it is unclear from the record whether Plaintiff presented on or prior to this date. *See* Tr. at 576–78. Multiple records from Dr. Parker's office lack treatment dates and only contain the dates the providers signed the treatment notes. Because the exact date of the visits cannot be ascertained, the undersigned has summarized these records by referring to them as occurring "on or about" the date the treatment note was signed.

On or about August 15, 2017, Plaintiff complained of moderate-to-severe and worsening lumbar spine pain. Tr. at 584. She reported increased pain following a decrease in her MS Contin dosage. *Id.* She endorsed generalized weakness, paresthesia, decreased mobility, joint pain, muscle weakness, and tenderness. Tr. at 585. Dr. Parker increased MS Contin to 30 mg twice a day. *Id.*

On September 25, 2017, x-rays of Plaintiff's lumbar spine showed mild DDD and facet arthropathy at L5–S1, no significant interval change from the prior study, and no instability on lateral flexion or extension views. Tr. at 538.

Plaintiff returned for follow up and rated her pain as a seven on or about September 26, 2017. Tr. at 587–89. She stated her medication regimen was working well and allowing her to better function with ADLs. Tr. at 587. Dr. Parker indicated he would hold off on injections because Plaintiff was participating in a clinical trial through MUSC. *Id.* He continued MS Contin 30 mg twice a day. Tr. at 588.

On or about October 17, 2017, Plaintiff reported stable pain she rated as a seven. Tr. at 590. She endorsed generalized weakness, difficulty walking, and muscle weakness. Tr. at 591. Dr. Parker discontinued Gabapentin and prescribed Lyrica 75 mg twice a day. Tr. at 590, 591.

On or about November 21, 2017, Plaintiff rated her pain as a six and indicated her medication was working well, allowing her to better function in ADLs. Tr. at 593. She endorsed difficulty walking, paresthesia, and muscle weakness. Tr. at 595. Dr. Parker refilled her medication "as is" and instructed her to pick up a three-week supply of medication on November 28, 2017. Tr. at 593.

Dr. Parker completed a medical release/physician's statement for SCDSS on December 19, 2017. Tr. at 539–40. He noted Plaintiff's disability was permanent and she could only engage in part-time work. Tr. at 539. He indicated Plaintiff could sit for two or four hours, stand for two hours, walk for two hours, climb stairs/ladders for two hours, and keyboard for six hours during a workday. *Id.* He suggested Plaintiff could not kneel/squat, bend/stoop, or lift/carry throughout the workday. *Id.* He stated Plaintiff could not lift/carry objects weighing more than 10 pounds for more than one hour per day. *Id.*

On or about January 16, 2018, Plaintiff rated her pain as a six and indicated her medication regimen was working well and allowing her to function in ADLs. Tr. at 596. She endorsed generalized weakness, difficulty walking, paresthesia, and muscle weakness. Tr. at 598. Dr. Parker refilled MS Contin 30 mg twice daily. *Id.*

On February 2, 2018, x-rays of Plaintiff's lumbar spine showed mild lumbar spondylosis, no evidence of dynamic instability with flexion and extension, and decreased ROM in flexion. Tr. at 643–44.

Plaintiff presented for medication refills on or about February 13, 2018. Tr. at 600–02. She endorsed generalized weakness, difficulty walking, paresthesia, anxiety, and muscle weakness. Tr. at 602. Dr. Parker noted Plaintiff was unable to receive an injection because she was continuing to participate in the clinical trial through MUSC. Tr. at 600. He refilled Lyrica 75 mg twice a day and MS Contin 30 mg twice a day. Tr. at 602.

On or about March 13, 2018, Plaintiff reported her medication treatment plan was working well. Tr. at 603. She endorsed generalized weakness, gait disturbance, anxiety, depression, insomnia, and muscle weakness. Tr. at 604. Dr. Parker noted Plaintiff was scheduled to follow up at MUSC for the clinical trial in June and might be cleared to receive additional injections following that visit. Tr. at 603. He refilled MS Contin 30 mg, but did not refill Lyrica, as Plaintiff reported having plenty. *Id.*

Plaintiff presented to Michael N. Bohan, M.D. ("Dr. Bohan"), with a complaint of right hip pain on or about March 30, 2018. Tr. at 606. She also complained of difficulty falling sleep, nighttime awakening, and stiffness. *Id.* Dr. Bohan reviewed x-rays that showed mild degenerative joint disease ("DJD") of the bilateral hips, but no acute findings. *Id.* He noted paraspinal

tenderness, painful and reduced ROM of the lumbar spine, and mild swelling, tenderness, and decreased ROM to the right hip. Tr. at 608–09.

On or about April 17, 2018, Plaintiff rated her pain as an eight and reported her medication regimen was working well and permitting her to function with her ADLs. Tr. at 613. She endorsed difficulty walking, paresthesia, and muscle weakness. Tr. at 615. Dr. Parker refilled Lyrica and MS Contin. *Id.*

Plaintiff followed up with Dr. Parker for medication refills and to discuss MRI results on August 30, 2018. Tr. at 618. She endorsed bilateral lumbar pain with associated weakness, numbness, tingling, and swelling. *Id.* She indicated her medication regimen was working well and permitting her to better function with ADLs. Tr. at 619. Dr. Parker stated Plaintiff had failed lumbar ESI. *Id.* He reduced MS Contin to 15 mg and refilled Lyrica 150 mg. *Id.* He explained that he was "looking to wean meds," as Plaintiff was interested in obtaining a spinal cord stimulator. *Id.* He referred Plaintiff to psychiatry for a spinal cord stimulator evaluation. *Id.*

On September 25, 2018, Plaintiff rated her pain as an eight and endorsed weakness, numbness, tingling, and swelling. Tr. at 649. Dr. Parker noted Plaintiff's insurance provider had denied the request for a spinal cord stimulator and she intended to appeal. Tr. at 650. He stated Plaintiff's

medication regimen was working well such that she could function better with ADLs. *Id.* He refilled Lyrica and MS Contin. *Id.*

On October 4, 2018, Kelsy Nigels provided a letter confirming that Plaintiff had participated in a clinical study for the treatment of DDD of the lumbar spine from April 5, 2017, through February 8, 2018. Tr. at 636.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on October 26, 2018, Plaintiff testified she was 5' tall and weighed 155 pounds. Tr. at 38. She indicated she was married and her husband worked. *Id.* She admitted she continued to drive, but noted her husband had driven her to the hearing. *Id.*

Plaintiff denied having worked or received unemployment or workers' compensation benefits since August 2015. Tr. at 38, 40. She stated she had last worked as a server at Office Italian Pub. Tr. at 38. She said she had previously worked as a banquet houseman for Hilton Corporation, setting up tables and chairs, serving during banquets, and cleaning up. Tr. at 39. She noted she was a working supervisor in that position. *Id.*

Plaintiff testified she was unable to work because she experienced chronic pain primarily on the right side of her body, from her lower back to her right foot. Tr. at 40. She described the pain as constant and varying in

intensity, with some days being better than others. *Id.* She stated her pain was exacerbated by any physical activity. *Id.* She said Dr. Parker prescribed Morphine and Lyrica to address her pain and indicated she had been taking the medications for two years. *Id.* She stated she visited Carolina Orthopedics once a month. *Id.* She explained that her insurance had declined her doctor's request to cover a spinal cord stimulator. *Id.* She admitted that she desired to stop taking opioid medication. *Id.* She said surgery was not likely to be effective. Tr. at 40–41.

Plaintiff said she had side effects from medication that included tiredness, dry mouth, dizziness, constipation, sleeplessness, sleepiness, and restlessness. Tr. at 41. She stated her medication was only about 60% effective. *Id.* She explained that her facet joints were rubbing against each other and against her nerves, causing pain to radiate down her leg. *Id.*

The ALJ questioned Plaintiff as to why Dr. Parker's exam notes indicated no loss of strength in her legs and normal sensation and reflexes. *Id.* He stated those findings were "not really consistent with what he is saying is causing the pain." *Id.* Plaintiff stated Dr. Parker was "very short" with her during visits, only seeing her for about five minutes each month and had not "done a physical examination . . . in over a year." *Id.*

Plaintiff testified she could sit in a chair for about 15 minutes prior to getting up. Tr. at 42. She estimated she could stand for 20 to 30 minutes at a

time if she could shift her weight to her left side. *Id.* She said she could likely walk a quarter of a mile on a level surface. *Id.* She stated Dr. Parker had advised her not to lift more than five to 10 pounds. *Id.* She denied having any difficulty using her hands. *Id.*

Plaintiff stated she was taking a low-dose antidepressant, but did not feel that it was really helping her. Tr. at 42–43. She indicated Dr. Parker had recommended counseling. Tr. at 43. She denied having visited a counselor, as she could not find one who was covered by her insurance and close to her home. *Id.* She said she often felt tired, did not maintain her grooming as well as she should, and cried for no reason. *Id.*

Plaintiff described her pain as shooting down her leg. Tr. at 44. She said she sometimes felt as if she had been punched repeatedly in her hip. Tr. at 44–45. She described some numbness primarily in her right foot, but noted the bottom half of her right leg felt as if it were falling asleep with pins-and-needlelike tingling. Tr. at 46. She said she typically rated her pain as an eight. Tr. at 45. She noted she could lift a gallon of milk with some pain and tried to lift with her other arm when possible. *Id.* She explained she would not even get out of bed on her bad days because it was sometimes difficult for her to lift her feet over her bed and get out. *Id.* She estimated she had 15 to 20 bad days per month. Tr. at 45–46.

Plaintiff stated she took Lyrica for neuropathy. Tr. at 46. She said she did not feel her legs were as strong as they had been in the past. *Id.* She noted she used a cane to walk and had been doing so for a year-and-a-half. *Id.* She indicated she would not be able to walk a block at a reasonable pace on a rough or uneven surface without the use of a handheld device or assistance. *Id.* She denied being able to climb a few stairs at a reasonable pace without use of a single handrail. Tr. at 47. She said she was better able to push than pull, as pulling caused strain and required she shift her weight. *Id.* She endorsed difficulty bending and stooping. *Id.*

Plaintiff testified her prior treatment included nerve blocks, radiofrequency lesioning, cortisone injections, and participation in a stem cell clinical trial. Tr. at 47–48. She said Dr. Parker had been unable to provide any injections or surgical procedures during the period that she was participating in the clinical trial. Tr. at 53–54. She denied that any methods or procedures had improved her condition. Tr. at 48, 54.

Plaintiff stated she frequently had difficulty completing tasks. *Id.* She said the amount of time she could focus on an activity tended to vary, but noted she could only read a couple of pages before she would have to reread the material. *Id.* She felt that she would probably not be able to finish work tasks even though she had no past difficulty performing work tasks. Tr. at

48–49. She said her memory was affected by her impairment. Tr. at 49. She noted she experienced decreased energy and fatigue daily. *Id.*

Plaintiff testified that prior to developing chronic pain, she had been a "workaholic," working six or seven days a week[2] and maintaining a full social life. *Id.* She said she had maintained her home, cooked, attended concerts, and traveled. *Id.* She felt that she could no longer engage in those activities. *Id.* She said she was most bothered because she was no longer contributing to her household. *Id.* She stated she felt like she would never be out of pain and did not believe she could maintain substantial gainful employment. *Id.*

Plaintiff testified she lived in an apartment with her husband. Tr. at 43. She said her husband assisted her in getting in and out of the shower and dressing her lower body. Tr. at 43–44. She denied performing household chores, stating her husband performed all of them. Tr. at 44. She explained that she did not do laundry because she could not physically move items from the washer to the dryer. Tr. at 47. She said she spent most days watching television in her bed. Tr. at 44. She noted reading was difficult because her medication affected her ability to concentrate. *Id.* She estimated she spent one to one-and-a-half hours a day on her feet. *Id.* Plaintiff admitted she could visit a store alone to pick up small items. Tr. at 46. She stated her husband

---

[2] The ALJ commented that Plaintiff's earnings did not seem to be consistent with the hours she reported having worked. Tr. at 50. Plaintiff's certified earnings records for the years 1992 through 2018 reflect her highest reported earnings as $17,540 in 2010. Tr. at 181–82.

did most of the grocery shopping and she did most of her other shopping online. Tr. at 47.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Thomas C. Neil, Ph.D., reviewed the record and testified at the hearing. Tr. at 50–52. The VE categorized Plaintiff's PRW as a server, *Dictionary of Occupational Titles* ("*DOT*") number 311.477-030, as requiring light exertion with a specific vocational preparation ("SVP") of 3, a dining room attendant, *DOT* number 311.677-018, as requiring medium exertion with an SVP of 2; and a banquet supervisor, *DOT* number 311.137-022, as requiring light exertion with an SVP of 6 per the *DOT* and medium exertion and an SVP of 5 or lower as performed. Tr. at 50–51. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work with no climbing of ladders or scaffolds; occasional stooping, crawling, kneeling, and crouching; no exposure to work hazards; and the ability to concentrate for two-hour segments to perform simple, repetitive tasks. Tr. at 51. The VE confirmed that Plaintiff's PRW would be precluded. *Id.* He testified the hypothetical individual could perform sedentary jobs with an SVP of 2 as a food and beverage order clerk, *DOT* number 209.567-014, a charge account clerk, *DOT* number 205.367-014, and a call-out operator, *DOT* number 237.367-014, with 9,500, 30,000, and 125,000 positions in the national economy, respectively. Tr. at 51–52.

The ALJ asked the VE to consider that the hypothetical individual would miss at least three days of work per month secondary to symptoms. Tr. at 52. He asked if there would be any jobs consistent with that limitation. *Id.* The VE testified the *DOT* did not address absences, but that a research study involving human resource managers indicated that an individual who was absent from work on three days per month would be unable to meet performance standards. *Id.* Therefore, he testified there would be no work for such an individual. *Id.* The VE confirmed that his testimony was otherwise consistent with the *DOT* to the best of his knowledge. *Id.*

Plaintiff's attorney declined to question the VE. *Id.*

### 2.    The ALJ's Findings

In his decision dated January 28, 2019, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2020.
2.    The claimant has not engaged in substantial gainful activity since August 26, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: degenerative disc disease. (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). Specifically, the claimant is able to lift and carry up

to 10 pounds occasionally and lesser amounts frequently, sit for 6 hours in an 8-hour day, and stand and walk occasionally. The claimant cannot climb ladders/scaffolds. She can occasionally stoop, crawl, kneel, and crouch and can have no exposure to work hazards. The claimant can concentrate in two-hour increments to perform simple, repetitive tasks.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on August 23, 1974 and was 41 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from August 26, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 20–28.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to fully evaluate whether Plaintiff's impairment met or equaled Listing 1.04;

2)    the ALJ did not consider Plaintiff's statements or explain his RFC assessment in accordance with SSRs 96-8p and 16-3p; and

3)    the ALJ failed to properly assess Dr. Parker's opinion.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a

party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Listing 1.04

Plaintiff argues the ALJ failed to fully analyze whether her impairment met or equaled paragraph A of Listing 1.04. [ECF No. 15 at 14–16]. She maintains the record reflected positive SLR, limitation of motion of the spine, muscle weakness, and reflex loss, as required by the listing. *Id.* at 15.

The Commissioner argues substantial evidence supports the ALJ's finding that Plaintiff's back impairment did not meet or equal Listing 1.04. [ECF No. 16 at 11]. He maintains the ALJ explicitly considered Plaintiff's DDD "pursuant to Listing 1.04." *Id.* at 13. He concedes that Plaintiff has cited evidence indicating she meets some of the criteria under paragraph A of Listing 1.04, but contends she has failed to show that she meets the introductory requirements of the listing for compromise of a nerve root or compromise of the spinal cord with evidence of nerve root compression. *Id.* at 13–14. He points out that the ALJ repeatedly referenced imaging that showed mild findings with no severe central or canal narrowing. *Id.* at 14. He claims the ALJ did not deny the claim because evidence consistent with meeting the listing was not simultaneously present, but denied it because all elements of the listing were not met. *Id.* at 15–16.

At step three of the sequential evaluation process, the ALJ should identify relevant listings and compare their medical criteria with the

symptoms, signs, and laboratory findings of the claimant's impairments, as shown in the medical evidence. *Cook v. Heckler*, 783 F.3d 1168, 1173 (4th Cir. 1986); 20 C.F.R. §§ 404.1508, 416.908. The claimant bears the burden of proving that her impairment meets the listing. *Henderson v. Colvin*, 643 Fed. App'x 273, 276 (4th Cir. 2016) (citing *Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir. 1986)); *see also Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) ("At the third step, the burden remains on the claimant, *see Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995), and he can establish his disability if he shows that his impairments match a listed impairment, *see Mascio*, 780 F.3d at 634–35.").

For a presumption of disability to apply based on paragraph A of Listing 1.04, the evidence must show all of the following: (1) a disorder of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture); (2) compromise of a nerve root (including the cauda equina) or the spinal cord with evidence of nerve root compression; (3) neuro-anatomic distribution of pain; (4) limitation of motion of the spine; (5) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss; and (6) if there is involvement of the lower back, positive SLR test (sitting and supine). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 1.04(A). "For a

claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

In *Radford v. Colvin*, 734 F.3d 288, 294 (4th Cir. 2013), the court explained:

> We hold that Listing 1.04A requires a claimant to show only what it requires him to show: that each of the symptoms are present, and that the claimant has suffered or can be expected to suffer from nerve root compression continuously for at least 12 months. 20 C.F.R. § 404.1509. A claimant need not show that each symptom was present at precisely the same time—i.e. simultaneously—in order to establish the chronic nature of this condition. Nor need a claimant show that the symptoms were present in the claimant in particularly close proximity.

The ALJ stated he had considered Plaintiff's DDD "pursuant to Listing 1.04" and set forth the requirements for a finding of disability under each of the three paragraphs of the listing. Tr. at 22. He concluded Plaintiff did not have an impairment or combination of impairments that met a listing. Tr. at 21. He did not explain at step three his reasons for concluding that Plaintiff's impairment did not meet Listing 1.04A. *See* Tr. at 21–22. However, he subsequently addressed the relevant criteria under the listing in discussing the RFC assessment:

> The claimant alleges disability as a result of low back pain. Imaging indicates she has mild to moderate degenerative changes of her lumbar spine. Most of the treatment notes are pain management that are not supported by clinical examinations, and the claimant admitted that Dr. Parker has not performed a physical examination on her in over one year. The examinations that do exist do not indicate any motor or

37

neurological deficits. Multiple radiographs are equivocal involving nerve root involvement.

Tr. at 26.

The ALJ discussed the November 2015 MRI, noting Plaintiff was assessed "with lumbar disc degeneration from L4–S1 with mild stenosis at L4–5 without significant neurocompressive phenomenon or significant disc space narrowing." Tr. at 24. He discussed other imaging reports, noting:

> Additional lumbar imaging performed in April 2017 revealed mild degenerative disc disease and moderate facet arthropathy most pronounced at L4–5 and L5–S1 was noted to be a potential source of non-radicular pain. (Exhibit 9F). No severe stenosis was seen. Imaging performed in August 2017 revealed no significant interval change from prior studies. September 2017 imaging revealed no significant interval change and no instability on the lateral flexion or extension views.

Tr. at 25–26.

The undersigned has considered whether the ALJ properly evaluated diagnostic imaging results showing "contact" with the nerve roots in concluding that Plaintiff did not have compromise of a nerve root or the spinal cord with evidence of nerve root compression, as required to meet Listing 1.04(A). On April 13, 2017, an MRI of Plaintiff's lumbar spine showed contact and slight deflection at the left lateral L5–S1 recess with no severe canal or exit narrowing. Tr. at 534. On May 16, 2017, a post-discogram CT scan showed contact at the left lateral L5–S1 recess. *See* Tr. at 536. Other courts have rejected arguments that contact with a nerve root or the spinal

cord is equivalent to "compromise" of a nerve root or the spinal cord, as required pursuant to Listing 1.04. *See Telfaire v. Berryhill*, C/A No. 3:18-3449-BRM, 2019 WL 4745614, at *4 (D.N.J. Sept. 30, 2019) (providing that a disc herniation "abutting the nerve root" does not show compromise of the nerve root); *Dier v. Colvin*, C/A No. 13-502S, 2014 WL 2931400 (W.D.N.Y. June 27, 2014) (finding "contact with a nerve root," "mild contact with the thecal sac," and "possibly some slight contact with the right S1 nerve root" did not show that any nerve roots were "compromised"; *Pearson v. Colvin*, C/A No. 4:12-23-FL, 2013 WL 3243550, at *10 (E.D.N.C. June 26, 2013) (concluding that Listing 1.04 required a clinical finding of compression and that mere contact with the spinal cord was insufficient). Given these courts' findings and in the absence of any findings to the contrary, the undersigned finds that evidence of contact with a nerve root is insufficient to satisfy the requirement for compression of a nerve root or the spinal cord under Listing 1.04A.

The ALJ cited substantial evidence to support his finding that Plaintiff was not presumptively disabled based on Listing 1.04. Because all elements of the listing must be met and the imaging reports did not show compromise of a nerve root or the spinal cord with evidence of nerve root compression, it is of no consequence that the other elements of the listing were present in the record.

### 2.     RFC Assessment and Subjective Symptom Evaluation

Plaintiff argues the ALJ failed to evaluate her statements concerning the intensity, persistence, and limiting effects of her symptoms in accordance with SSR 16-3p and did not explain his RFC assessment as required by SSR 96-8p. [ECF No. 15 at 16–19, 23–24]. She maintains the ALJ did not account for trochanteric bursitis of her right hip in the RFC assessment, consider her repeated statements that sitting for extended periods increased her pain, or explain his finding that she could sit for six hours in an eight-hour workday. *Id.* at 18–19, 23–24. She contends the ALJ neglected to explain which of her ADLs were inconsistent with her reported symptoms. *Id.* at 24.

The Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff could perform sedentary work. [ECF No. 16 at 16]. He maintains the ALJ compared Plaintiff's allegations to the medical and other evidence and noted that much of the record was devoid of significant deficits and showed improvement with medication. *Id.* He notes the ALJ identified specific inconsistencies between Plaintiff's allegations and her ADLs. *Id.* He contends Plaintiff failed to identify any evidence the ALJ neglected that would support a determination that she could not meet the sitting requirements of sedentary work. *Id.* at 17.

A proper RFC assessment requires the ALJ to consider all the relevant evidence and account for all of the claimant's medically-determinable

impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ must determine the claimant's ability to perform mental and physical work-related functions on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *2. He must include a narrative discussion describing how all the relevant evidence supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations). *Id.* at *7. He must explain how he resolved any material inconsistencies in the record. SSR 16-3p, 2016 WL 1119029, at *7.

The claimant's statements are among the evidence the ALJ must consider and reconcile with his RFC assessment. "[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)[5]). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). The ALJ only proceeds to the second step if the claimant's impairments could reasonably produce the symptoms she alleges. *Id.* At the second step, the ALJ is required to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)). He must

[5] The provisions in 20 C.F.R. § 404.1529 correspond to 20 C.F.R. § 416.929 for SSI claims.

"evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6. However, he is not to evaluate the claimant's symptoms "based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.* at *4; *see also Arakas v. Commissioner, Social Security Administration*, _ F.3d _, 2020 WL 7331494 at *8 (4th Cir. Dec. 14, 2020) ("We also reiterate the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms.").

In evaluating the alleged limiting effect of a claimant's symptoms, the ALJ is to consider other evidence that "includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." SSR 16-3p, 2016 WL 1119029, at *5; *see also* 20 C.F.R. § 416.929(c) (listing factors to consider, such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms).

Pursuant to SSR 16-3p, the ALJ must explain which of the claimant's symptoms he found "consistent or inconsistent with the evidence in [the] record and how [his] evaluation of the individual's symptoms led to [his] conclusions." 2016 WL 1119029, at *8. He must evaluate the "individual's symptoms considering all the evidence in his or her record." *Id.*

In *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019), the court explained that "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion. It has repeatedly recognized that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

The ALJ failed to consider DJD of Plaintiff's right hip in assessing her RFC. He addressed only Plaintiff's DDD and medication-related side effects in explaining the provisions he included in the RFC assessment, writing:

> In sum, in light of the claimant's history of low back pain secondary to degenerative disc disease, the undersigned has limited the claimant to sedentary work with the postural and hazard limitations set forth above. Additionally, due to the claimant's use of opiate medication, the undersigned has limited her to . . . simple, repetitive work allowing her to concentrate in two-hour increments. However, due to the aforementioned inconsistencies, particularly the relatively benign physical and mental examinations and the extent of the claimant's daily activities, the undersigned cannot find the claimant's allegation

that she is incapable of all work activity to be consistent with the medical evidence of record as a whole.

Tr. at 26.

If Plaintiff's allegations as to right hip pain were unsupported by objective evidence, the undersigned would be inclined to find no error in the ALJ's failure to consider them in assessing her RFC. *See Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§ 404.1529(b), 416.929(b) (providing the claimant's statements should only be considered if her impairments could reasonably produce the symptoms she alleges). However, that is not the case. On March 30, 2018, Dr. Bohan reviewed x-rays that showed mild DJD of the bilateral hips and observed mild swelling, tenderness, and decreased ROM to the right hip. Tr. at 608–09. Given that evidence and the specific complaints set forth below, the ALJ was required, pursuant to SSR 96-8p, to explain how he accounted for Plaintiff's right hip impairment.

Despite having failed to address DJD of Plaintiff's right hip in setting forth her RFC, the ALJ acknowledged some of Plaintiff's statements as to right hip impairment and impaired sitting ability. In summarizing the evidence, the ALJ acknowledged Plaintiff's allegation that she could sit for 15 minutes. Tr. at 23. He noted her March 2016 complaint to Dr. Parker of pain with right hip ROM and her May and September 2016 complaints of right hip pain. Tr. at 24–25. He also cited Plaintiff's September 2016 report that

wearing a back brace helped her when sitting and her complaint of right hip pain in April 2018. Tr. at 25.

Although the ALJ found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record," *id.*, he offered no specific reason for rejecting Plaintiff's claim as to reduced sitting ability. As SSR 96-8p requires the ALJ to resolve inconsistencies and ambiguities in the record, he should have explained his reasons for concluding that Plaintiff could meet the sitting requirements of sedentary work, despite her allegations.

While the Commissioner points to the ALJ's statement that "the extent of [Plaintiff's] daily activities" were inconsistent with her allegations, Tr. at 26, the ALJ did not explain this statement. He summarized Plaintiff's allegations as to her ADLs as follows:

> Regarding her activities of daily living, the claimant alleged that two hours after taking her medication, she falls asleep and spends most of each day in bed. She stated that she does not shower until her fiancé is home for the day. The claimant does help feed the family pets. She reported poor sleep due to pain. Regarding her person[al] care, the claimant alleged that she needs help dressing, cannot get in and out of the tub/shower on her own, cannot bend to shave her legs, and needs help cooking. The claimant sets an alarm to remind her when to take her medication. She is able to prepare simple meals and sandwiches daily. The claimant denied performing any household chores. She goes outside daily to check the mail and is able to drive a car. The claimant is able to shop in person and online and stated that she needs help from her fiancé. She stated that she is able to

maintain her finances. The claimant reported hobbies and interest include watching television, reading, and socializing with friends, although she also stated that she no longer engages in social activities. Functionally, the claimant stated that she is able to walk one block, is able to pay attention in order to complete tasks, and follows instructions easily. The claimant is able to handle stress and changes in routine. She had no allegation of reduced memory, focus, or concentration. The claimant noted sleepiness and other adverse side-effects secondary to taking morphine.

Tr. at 23–24. Contrary to the court's direction in *Thomas*, the ALJ left out a logical explanation as to how this evidence was inconsistent with Plaintiff's allegations. Thus, the court is left to guess as to how the described ADLs are inconsistent with Plaintiff's allegations, particularly her allegations as to reduced ability to engage in prolonged sitting.

Because the ALJ did not comply with the provisions of SSRs 96-8p and 16-3p in assessing Plaintiff's statements and her RFC, the court is constrained to remand the case.

### 3.    Additional Allegation of Error

Plaintiff argues the ALJ improperly weighed Dr. Parker's December 2017 opinion given the relevant factors in 20 C.F.R. § 404.1527(c) and § 416.927(c). Having recommended remand on other grounds, the undersigned declines to specifically address this alleged error, but cautions the ALJ that, should he decline to issue a decision that is fully favorable to the claimant, his decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case

record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." SSR 96-2p, 1996 WL 374188, at *5 (1996).

## III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

January 5, 2021                                     Shiva V. Hodges
Columbia, South Carolina                United States Magistrate Judge